FAVAZZA *v.* NEW YORK LIFE INS. CO.

(*Nashville*, December Term, 1934.)

Opinion filed January 12, 1935.

HUNTER LANE, of Memphis, for appellant.

KING & KING, of Memphis, and LOUIS H. COOKE, of New York City, for appellee.

MR. JUSTICE McKINNEY delivered the the opinion of the Court.

This is a suit on a lapsed life insurance policy, issued on January 11, 1928, on the life of C. P. J. Favazza, who was twenty-one years of age at that time. The wife of insured was named as beneficiary, but later the beneficiary was changed to complainant, who is the mother of insured. The quarterly premium to be paid was

$32.25. The policy provided (1) for the payment of $5,000 upon receipt of proof of death, or (2) $10,000 if death result from accident, and (3) upon receipt of due proof of total and permanent disability monthly indemnity of $50, and waiver of premiums during such disability. The insured paid his premiums up to January 11, 1930. He died January 8, 1931.

The suit is predicated upon the theory that insured was totally and permanently disabled when the January 11, 1930, premium became due, and that the company had knowledge of that condition and is estopped to rely upon insured's failure to claim indemnity and to file formal proof of such disability. The involved provision of the policy is as follows:

"In event of default in payment of premium after the Insured has become totally disabled as above defined, the policy will be restored and the benefits shall be the same as if said default had not occurred, provided due proof that the Insured is and has been continuously from date of default so totally disabled and that such disability will continue for life or has continued for a period of not less than three consecutive months, is received by the Company not later than six months after said default."

The two following issues were submitted to the jury, both of which were answered in the affirmative, to-wit:

"First, was the insured, Charles P. J. Favazza, so disabled by disease that he was wholly prevented from performing any work, from following any occupation, or from engaging in any business for remuneration or profit on February 11, 1930, which was the last day of the grace period for the payment of his premium?

"Second, if you answer the first issue 'Yes,' then answer whether the Insurance Company, within six months from February 11, 1930, received due proof that the insured was and had been from the date of default, so totally disabled, and that such disability would continue for life, or had continued for a period of not less than three consecutive months?"

The chancellor seemed in doubt as to whether he should sustain the defendant's motion for a directed verdict, but finally decided to let the case go to the jury. The Court of Appeals reversed the decree of the chancellor, sustained the defendant's motion for a directed verdict, and dismissed the bill. The opinion was prepared by Judge CROWNOVER and was concurred in by Judge SENTER. Judge ANDERSON filed a dissenting opinion, upon the theory that the defendant knew, or should have known that the insured was totally and permanently disabled, should have so advised him and paid the indemnity due in that situation, notwithstanding insured had never claimed either verbally or in writing that he was totally and permanently disabled, and had never made any claim for compensation on account of disability. On the other hand, insured, on March 11, 1930, applied in person for reinstatement, and, in his written application, stated that he was in good health, had gained five pounds in weight during the past five years, had not consulted a doctor for five years, and was then engaged in writing life insurance. The company's physician, Dr. Campbell, made the usual examination given one who is applying for insurance, and reported to the company: "Except for murmur & slight cardiac hypertrophy, applicant stands good examination." Dr. Campbell further reported that the heart murmur was well compensated.

Every physician who testified in the case stated that one so affected may perform the usual duties and live the normal span of life. Insured died from bacterial endocarditis, resulting from an infected throat. Dr. Campbell testified that, when he examined insured on March 11, 1930, he discovered nothing to indicate that he had endocarditis.

The first physician who treated insured was Dr. Simpson. We quote from his testimony as follows:

"Q. I will ask you to tell this Court and jury what he came to you for, what his condition was, and what you did for him.

"A. Charlie Favazza came to me on the 23rd day of August, 1929, suffering with a severe throat trouble. He gave a history of having been sick for several weeks, and that he had been sick in bed for several days before coming to my office. When I saw him he was walking about, but quite sick, had a temperature about 102, and he had complained of his throat being very sore. Of course, I at once examined his throat, and he had what we call a quinsy peritonsillar abscess, an abscess around the tonsil, with the swelling—the abscess was on the right side. I at once, under a local anaesthesia, opened his abscess on the left side—right side of his throat, and evacuated about three or four ounces of pus. That was on the 23rd, and then I saw him off and on for several days, and he rapidly improved. After about a little over a week in time the most of the pus was gone. There was very much less swelling, and he was able to do better. Able to get around somewhat better. Then he disappeared from my office and did not come back again.

"Q. I will ask you what you advised Charlie to have done at that time, Dr. Simpson?

"A. I advised him to have his tonsils removed in two or three weeks after I first saw him. That is, as soon as all the acute inflammation would disappear, I advised that he should have his tonsils removed.

"Q. I will ask you if you would say Charlie Favazza at that time had a severe septic sore throat?

"A. Yes sir. He had abscesses in the tonsils and was sick.

"Q. I will ask you, Dr. Simpson, if such a throat as Charlie Favazza had could and often does produce bacterial endocarditis?

"A. It does, quite often.

"Q. I will ask you as a throat specialist what is one of the most usual causes of bacterial endocarditis?

"A. Tonsil infection.

"Q. Charlie Favazza died of heart trouble, subacute bacterial endocarditis, assuming this, if he had this throat trouble—this is a hypothetical question—and no other infection was brought to your attention, and he died of subacute endocarditis, tell the jury if you would say that the septic throat, abscessed throat, caused the endocarditis?

"A. I would say that is very likely, that throat infection very likely did cause all the trouble set up in the arteries of endocarditis."

Insured was engaged during the months of October, November, and December of 1929, and the months of January and February of 1930, in writing life insurance for the Columbian Mutual Life Insurance Company, having written insurance during that period to the amount of $65,000. He was regularly instructed by the agents

of his employer as to the various kinds of insurance, and wrote policies providing compensation for total and permanent disability, with waiver of future premiums. He was intelligent, and had gone through the eighth grade of the Memphis city schools. There is no basis for assuming that he was not familiar with the terms and provisions of his policy. For several months, beginning about the 1st of January, 1930, he was also engaged in operating a truck between Memphis and St. Louis.

Early in March, while insured was in St. Louis, complainant came to the local office in Memphis, and stated that insured was sick and that she had come to pay the premium on his policy. She was advised that the policy had lapsed, and that he could apply for examination and reinstatement, which he did on March 11, as heretofore stated. The company declined to reinstate him, except on payment of a considerably increased premium, which he was unwilling or unable to pay, and no further action was taken until after his death in the following January.

Some time in May, 1930, insured had his tonsils removed by Dr. Levy. Dr. Levy did not testify, and the record is silent as to the effect of this operation. Insured was admitted to the Memphis General Hospital on June 9, 1930. He was attended by Dr. Watson, who diagnosed his case as endocarditis, which is blood poisoning. He was discharged July 7, 1930, but left the hospital against the advice of the hospital authorities. The foregoing appears from the hospital records. Dr. Watson did not testify. He again entered the General Hospital on October 24, 1930, and was discharged November 25 following, and, as previously stated, died on January 8, 1931. There is medical testimony to the effect that one af-

flicted with endocarditis lives from six to eighteen months. Certainly, under the foregoing state of facts, it cannot be contended that the insurer knew, or had any reasonable cause to believe, that insured was totally and permanently disabled, so that he was "wholly prevented from performing any work, from following any occupation, or from engaging in any business for remuneration or profit." Insured in his application for reinstatement, which the company had a right to rely upon, stated that he had no disease, was in good health, had gained in weight, and was engaged in a gainful occupation. The medical examination confirmed his statement, with the exception of the heart lesion, of which he was ignorant. He made the false statement that he had not consulted a physician within five years. The statements which he made and the examination of Dr. Campbell negative the theory now advanced that he was suffering at that time with endocarditis. The insured was an intelligent young man, was experienced in writing life insurance, and fully realized that he was not totally and permanently disabled, and made no claim to that effect. To say that in these circumstances the company was obligated to discover and disclose to him that he was suffering with blood poisoning, which rendered him totally and permanently disabled, transcends the bounds of reason and conflicts with the requirements of the contract which the parties entered into. The insured knew better than any other person whether he was incapacitated to work, and under the agreement he was to make claim for compensation, supported by due proofs of total and permanent disability. We have been cited to no authority that imposes upon the insurer the duty to use diligence in ascertaining the existence of disability. If

such were the law, then these companies would be at the mercy of designing beneficiaries, notwithstanding the plain provisions of the contracts requiring the beneficiaries to take affirmative action as a condition precedent to establishing liability against the insurers. If the doctrine of estoppel has any application in this cause, it should be applied to the insured rather than to the company.

It is argued that the offer of the company to reinstate insured at such a large increase in premium indicates that the company had some information, which it has not disclosed, that led it to believe that this was a hazardous risk, and counsel draw an inference from this circumstance that the company was aware that insured had endocarditis. Surely if the company had knowledge that insured had this disease which would terminate his existence in from six to eighteen months, it would not have offered to reinstate him for the designated premium of $79 per quarter. The facts are that shortly after this policy was issued the company received information that this was not a desirable risk. The nature of this information is not disclosed, but on June 4, 1928, the company wrote the Memphis office to the effect that, should this policy lapse, reinstatement will only be considered on receipt at the home office of evidence of insurability, including a full medical examination by the company's examiner. This letter was written long before it is even claimed that insured's health had become impaired. Upon receipt of the foregoing letter, the Memphis office noted on insured's premium card "I R.," indicating "impaired risk." So that, when complainant came to the office in March, 1930, to pay the premium on this policy, the cashier quite naturally

informed her that the policy had lapsed, and that insured would have to apply for reinstatement and undergo a medical examination. It further appears that, when this application for reinstatement was made, the company applied to the Merchants' Credit Association for a report on insured. This report is filed as an exhibit, and states that insured has been in the employ of the Columbian Mutual Life Insurance Company for the past six months, that he has not recently complained of any ailment, and that he has not had any serious illness within the past three years. In response to inquiry as to use of intoxicants, this report states: "Drinks only to mild hilarity." Insured in his application for reinstatement had stated that he was a total abstainer.

The evidence further shows that one with a heart lesion is below normal, which affects the risk, notwithstanding one so afflicted, if careful, can engage in most any ordinary work that does not involve physical strain, and may live out his expectancy. In view of the foregoing, the company very correctly concluded that this was an impaired risk. Much emphasis is placed upon the testimony of complainant that, when she appeared at the local office in Memphis, in March, 1930, she informed the cashier that insured was ill and had been sick since August, 1929. While this is contradicted by the statement of the insured four or five days later, it is only necessary to call attention to the fact that the policy provides no indemnity for sickness, and there is a wide distinction between "being sick" and being "totally and permanently disabled."

Another circumstance relied upon by complainant is the fact that, when the premium of $32.25 fell due on January 11, 1930, a dividend had been declared on

this policy in the sum of $29.90, which, if applied on the premium, would have reduced it to $2.45, and it is contended that the company acted in bad faith in not notifying the insured that he had that sum to his credit. In the first place, the policy does not provide for such notice. In the second place, there is no evidence that such notice was not given. In the third place, this matter was not made an issue in the cause, and for that reason was not developed by the evidence. All that the record shows is that the company mailed a notice to insured in December, 1929, to the address which he had furnished, informing him of the premium due on January 11, 1930. The notice was returned, insured having moved to another place without notifying the company of the change. The record is silent as to whether this notice also advised insured that a dividend had been placed to his credit. This question, however, has no direct bearing upon the issue as to whether insured, in compliance with the terms of his policy, gave the company due notice that he was totally and permanently disabled. We think the Court of Appeals was correct in holding that no such proof was received by the company.

▆ A policy of life insurance as between the company and the insured is merely a contract, and the relation between the policyholder and the company is purely contractual; his rights being measured by the terms of the policy or contract. 37 C. J. 378. We are unable to see where, within the purview of the policy, the company violated any duty which it owed to the insured.

The company has also filed a petition for writ of *certiorari*, in which it questions the finding of the Court of peals that there is some evidence to support the finding

of the jury on issue No. 1. In view of our conclusions as to issue No. 2, it becomes unnecessary to consider the petition of defendant. It follows that both petitions will be denied.